# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

LORI A. STIFFEY,           )
                                  )

      *Plaintiff*,        )

                                  )     **Civ. No. 15-1670**

      **v.**                   )

                                  )

CAROLYN W. COLVIN,       )
**Acting Commissioner of Social Security,**  )

                                  )

      *Defendant*.       )
                                  )

## MEMORANDUM OPINION

**Magistrate Judge Lisa Pupo Lenihan**

## I. Introduction

This case is before the Court on appeal from a final decision by the Defendant, the Acting Commissioner of Social Security ("the Commissioner"), denying the claim of Plaintiff Lori A. Stiffey ("Stiffey") for social security disability income ("SSDI") and supplemental security income ("SSI") under Title II and Title XVI, respectively, of the Social Security Act ("SSA"). Stiffey filed her Complaint seeking judicial review pursuant to 42 U.S.C. § 405(g), (ECF No. 3), and the parties have submitted cross-motions for summary judgment with briefs in support.[1] (ECF Nos. 12, 13, 18, 19). The Commissioner's motion seeks affirmance and Stiffey's motion seeks remand. In accordance with the provisions of 28 U.S.C. § 636(c)(1), the parties have voluntarily consented to have a United States Magistrate Judge conduct proceedings in this case, including the entry of a final judgment. For the following reasons, the Court will grant the Commissioner's motion, deny Stiffey's motion, and affirm the denial of benefits.

---

[1] As observed by <u>Oberley v. Colvin</u>, 2014 WL 2457398 at *1 n.1 (W.D. Pa. May 30, 2014), although Federal Rule of Civil Procedure 56 does not govern the District Court's judicial review of the Commissioner's decision under the Act, the parties often utilize cross-motions for summary judgment simply as a method for consideration of their respective positions.

## II. <u>Statement of the Case</u>

### A. Procedural History.

On September 7, 2012, Stiffey protectively filed an application for SSDI, and on September 10, 2012, she protectively filed an application for SSI. (ECF 13 at 3); R. 25.[2] Although she initially alleged that her disability began on November 19, 2006, she amended her onset date to May 20, 2010 at the hearing held on June 26, 2014. R. 72. Stiffey remained insured through December 31, 2012. Stiffey's claims were initially denied and she filed a timely request for a hearing, which was held before Administrative Law Judge ("ALJ") Brian W. Wood on June 26, 2014. R. 45. Stiffey was represented by counsel and testified at the hearing, as did an independent vocational expert ("VE"), Karen Crowell. R. 45. By Decision dated September 5, 2014, the ALJ determined that Stiffey was not disabled under the SSA, and therefore, was not entitled to SSDI or SSI benefits. R. 25-40.

Stiffey timely filed for review by the Appeals Council of the ALJ's determination that she was not disabled under the Act. The Appeals Council denied review on July 29, 2015. R. 1. Thus, the ALJ's Decision became the Commissioner's final decision for purposes of this Court's review. Having exhausted her administrative remedies, Stiffey filed the instant action seeking judicial review of the final decision of the Commissioner of Social Security denying her SSI and SSDI applications. With leave granted December 21, 2015, (ECF 2), Stiffey proceeds *in forma pauperis*.

### B. General Background

Stiffey has a high school education, R. 25, 40, 50, and attended online college studying business organization for four years, but did not obtain her bachelor's degree because she did not pay the matriculation fee. R. 50, 51. She was 41 years old on the amended date of her alleged

---

[2] Citation to the administrative record (ECF 7) is as follows: "R. __".

onset of disability, May 10, 2010, R. 49, 72, placing her in the age category of younger person under the regulations. 20 C.F.R. §§ 404.1563(c), 416.963(c). She lives at home with her husband and with her daughter, who attends college. R. 49. Stiffey previously worked as a school bus driver; as a teacher/counselor for a youth emergency shelter, which involved her watching the children, teaching them skills, taking them on outings, and doing paperwork; and on a paper route. R. 51, 52.

### C. Medical Record

#### 1. *Physical Health Treatment Records*

Stiffey underwent back surgery in 2006 and 2008 after being diagnosed with herniated nucleus pulposus. R. 353, 354. Surgery was to relieve low back pain that radiated into her right buttock and thigh as steroids and narcotics had only provided moderate pain relief. R. 352, 486. She also has degenerative disc disease, R. 353, 356, that ultimately may require a fusion procedure as indicated by her physician in February of 2008. R. 352-353.

Stiffey sought emergency room treatment for her low back pain in January of 2009, R. 269, and was prescribed analgesics, vicodin and a muscle relaxer. R. 268. At the beginning of February of 2010, a lumbar spine MRI revealed a mild degree of spinal stenosis in the L4-5 level with a bulging disk, recurrent moderate L5/S1 disk protrusion, and degenerative disc disease. R. 295. She was referred to physical therapy. R. 298. She appeared for a physical therapy evaluation on February 23, 2010, R. 297, at which she reported pain at its worse as high as 8 or 9 on a 10 point scale and difficulty sitting or standing for prolonged periods of time. R. 297, 298. The evaluation noted a decreased lumbar range of motion, decreased trunk strength, low back pain with radiculopathy, and gait abnormality. Stiffey only attended the single session of physical therapy. (ECF No. 13 at 6). May 24, 2010 treatment notes from her primary care

physician, Dr. Jeffrey Reyer, DO, also indicated that she experienced chronic low back pain. R. 359. On June 16, 2010, Stiffey was treated in the emergency room for pain related to her gall bladder, regarding which she indicated that she was to have it removed but had not done so because of the prior back surgeries. R. 272. Dr. Reyer's treatment notes from November 22, 2010 indicate no back pain. R. 361. On December 22, 2010, Stiffey was treated at an urgent care center by Dr. Laila Avelta for low back pain radiating down her left leg. R. 569-570. Dr. Avelta indicated left sciatica and prescribed steroids, vicodin, toradol and muscle relaxers. R. 570. As indicated in Dr. Reyer's treatment notes from January 17, 2011 and May 4, 2011, she did not present with back pain, R. 369, 373, but he noted in his treatment notes from visits for other issues in May 2011 and August 2011, that her issue with chronic low back pain continued, R. 377, 385, and also noted some relief with Robaxin. R. 357.

Stiffey was treated at the hospital on March 13, 2012, as a result of a fall, displayed pain on physical exam, and was diagnosed with low back pain, but denied any pain radiating down her legs, shortness of breath or chest pain. R. 304. An x-ray revealed moderate degenerative narrowing of the L5-S1 interspace but no spondylosis. R. 305. MRI on June 12, 2012 showed a minor annular bulge and mild to moderate facet arthrosis with mild bilateral recess narrowing at L4-5 and moderate L5-S1 disk space narrowing and desiccation with chronic endplate reactive changes, and moderate degenerative disk disease with no recurrent disk protrusion or nerve impingement. R. 306

Stiffey had her thyroid removed in 2005 due to cancer, and must take synthroid (levothyroxine) as a result, but is not fully compliant with taking her medication. R 302-303. She has a two pack a day history as a smoker, but indicated in 2012 and at the hearing that she was trying to decrease and attempt to quit smoking, and also indicated that she smoked a half of

a pack a day.  R. 69, 397, 606.  The records reflect Stiffey treated at the urgent care on January 27, 2010 for chest pain on breathing, and was prescribed steroids and vicodin.  R. 572-573.  Then in February 2010, Stiffey experienced shortness of breath and chest pain, had diagnostic imaging that was unremarkable, and again was prescribed steroids and vicodin.  R. 296.  On December 22, 2010, Stiffey treated at the urgent care for cough and chest pain and was prescribed steroids and vicodin.  R. 570-571.  Stiffey had a cardiac stress test on November 2, 2012 to evaluate her chest pain, R. 511, which revealed no evidence of ischemia, but which was stopped before completion due to Stiffey's shortness of breath.  R. 511.  Pulmonary function tests were performed March 8, 2013, revealing moderate airflow obstruction with mild restrictive defect and decreased diffusion lung capacity, which was suggestive of emphysema with smoking history and which also could be related to her body habitus (obesity) versus interstitial lung disease.  R. 586.  Her respiratory findings were normal in the beginning of 2014.  R. 558.

**Dr. Singh**.  Plaintiff began treating with Dr. Daljit "Davis" Singh, MD, on January 24, 2014, regarding her low back and leg pain and intermittent diarrhea. R. 557.  He reviewed her history and medications noting that she complained of back pain, headache, diarrhea, anxiety and depression, was then taking synthroid, baclofen, and acetaminophen/hydrocodone, and was treating with a psychologist for anxiety and depression and also taking Abilify, Klonopin, and Wellbutrin for her mental health.  R. 557.   Dr. Singh continued the prescription of acetaminophen/hydrocodone and muscle relaxer for her back pain.  R. 558.

### 2. *Mental Health Treatment Records*

Stiffey treated for her mental health at the Family Counseling Center of Armstrong County ("FCC") from June 24, 2010, through January 16, 2014.  R. 429, 601.  Several therapists and physicians, including Kelly M. Rock, CRNP ("Nurse Rock"), counselor Gayle Richardson,

M.A., Kimberly Altmeyer, LCSW, Dr. Mahendra Patil, M.D., and Dr. Mary Galonski, M.D., participated in her mental health care at FCC, which included several medical management appointments and counseling. Nurse Rock in particular treated Stiffey on numerous occasions at the FCC during that time period. Based on Stiffey's initial visit in 2010, Nurse Rock noted Stiffey's affect was constricted and fatigued; she was anxious, irritable and depressed; her short term memory was impaired; she expressed suicidal ideation in thoughts; and she maintained attention and had logical thought process. R. 430-431. Nurse Rock assessed Stiffey to have major depression, agoraphobia with panic disorder, and generalized anxiety, and prescribed her Celexa. R. 431. Her GAF[3] score in June of 2010 was 60. R. 431. Treatment notes from Kimberly Altmeyer from October 11, 2010, R. 434, indicate Stiffey's major depression, agoraphobia with panic disorder, and generalized anxiety continued, her GAF was then assessed at 58, R. 434, and Stiffey had not been compliant with therapy. R. 435. Dr. Patil assessed her on November 23, 2010 at the FCC, R. 439, with euthymic mood and appropriate affect, intact memory, logical thought process and assessed her GAF as 65. R. 437. Dr. Patil also noted that as Stiffey had been compliant with her medication for the past couple of weeks, she had noticed mood leveling and overall felt 60% better. R. 436.

Nurse Rock's February 24, 2011 notes indicate that Stiffey reported she had not taken her synthroid for a month or more because of the $3.00 co-pay, had dropped out of therapy, and had not gone to MD appointments that she should because of lack of money for gas. R. 440. Stiffey

---

[3] The Global Assessment of Functioning ("GAF") scale was devised by the American Psychiatric Association. It ranges from zero to one hundred and is used by a clinician to indicate an individual's overall level of functioning as a result of psychological, social, and occupational limitations. Am. Psychiatric Ass'n, Diagnostic and Statistical Manual (4th ed. Text Revision 2000), at p. 34. GAF scores in the range of 51 to 60 connote moderate symptoms or moderate difficulty in social, occupational, or school functioning, and GAF scores ranging from 61 to 70 indicate some mild symptoms and some mild difficulty. Id. The GAF has been eliminated in the Fifth Edition of the American Psychiatric Association's Diagnostic and Statistical Manual, however, as indicated in the Social Security Administration's July 13, 2013 Administrative Message issued as a result of the change in the Fifth Edition, SSA AM-13066 (July 13, 2013), the scale still is used as medical opinion evidence by the Social Security Administration.

also indicated she had a supportive friend who she helped deliver newspapers.  R. 440.  At that appointment, Stiffey indicated she had intermittent suicide ideation, was very tearful, rated her depression from 6-8 on a ten point scale, and had broken sleep due to health problems and pain.  R. 440.  Nurse Rock indicated that Stiffey's affect was constricted, her mood was depressed, but that her memory was intact, she was cooperative, maintained attention, and she had logical thought processes.  R. 441.  Nurse Rock saw Stiffey on March 17, 2011, and noted that Stiffey had low energy, was tearful, experienced poor sleep and had intermittent suicide ideation.  R. 444-445.  Nurse Rock next saw Stiffey on April 21, 2011, and Stiffey reported that her depression was well controlled and that she was taking medication consistently.  R. 446.  On July 28, 2011, Nurse Rock noted that Stiffey reported having good days and bad days, and rated her depression as an 8 and her anxiety as a 5-6 on a ten point scale.  R. 450.  Nurse Rock observed that Stiffey's mood was depressed, but her affect was appropriate, her memory was intact, her attention was maintained, and she was planning on spending time away in Indiana to reduce stress.  R. 450, 451.  Her medication was changed from Celexa to Effexor XR.  R. 452.  On August 18, 2011, Nurse Rock's notes indicate that Stiffey had a relationship with an individual in Indiana and was planning to be in Indiana for three months to "clear her head and 'relax,'" R. 454, 456; she had issues with sleep, anxiety, crowds; and she denied suicide ideation but indicated a passive death wish when completely stressed.  R. 454.

On March 1, 2012, Nurse Rock indicated that Stiffey had returned from Indiana in November of 2011 after being away for 3 months, had been off all of her psychiatric medications for 4-6 weeks at the time of her appointment, and her symptoms had returned including mood lability.  R. 460.  Stiffey reported that when she is off of her medications she has intermittent visual hallucinations consisting of intermittently seeing shadows and flashing lights.  R. 460.

7

Stiffey was assessed a GAF score of 55.  R. 462.  On April 24, 2012, Gayle Richardson, M.A., assessed Stiffey with a GAF of 55.   On May 17, 2012, Nurse Rock noted Stiffey's GAF was 57, R. 469, noted that Stiffey had not been consistent with taking her synthroid and noted that she had self-reduced her Effexor to half the dose because she felt tired and "zoned out" from the medication, but that Effexor had resulted in her feeling less depressed, less often.  R. 467.  The treatment notes also reflected that Stiffey's concentration and attention were poor at that time, R. 467, but that Stiffey indicated she does better when she keeps herself busy.  R. 467.  On August 22, 2012, she was assessed with a GAF of 58.  R. 471.  On October 25, 2012, Nurse Rock noted that Stiffey indicated that she had started Abilify and that her "visual hallucinations" had "eased off," her mood and paranoia had somewhat improved, and her depression was not as bad.   R. 474.   Stiffey was still experiencing irritability, R. 474, felt a bit more tired, continued to have problems with concentration, attention and focus, had good days and bad days, R. 474, and occupied her time with Facebook and arts and crafts.  R. 474.  The treatment notes for this appointment also indicated a diagnosis of bipolar disorder.  R. 474.  Nurse Rock's treatment notes from October 25, 2012, indicate a GAF of 57, R. 639, constricted affect, distracted attention, visual hallucinations, but logical thought process and no suicide ideation.  R.  638.  Treatment notes from November 20, 2012, indicated ongoing issues with depression and anxiety, racing thoughts and excessive worry.  R. 651.  They also reflect that Stiffey enjoys crafts, cooking, walking and computer games.  R. 650.  Treatment notes from November 29, 2012, indicate that Stiffey had 3-4 good days a week when she did not have anxiety associated with going places and doing things, but on bad days she felt depressed, irritable and edgy.  She had a lot of "anticipatory anxiety" and a passive death wish, but no panic attacks or suicide ideation.

R. 632.  Stiffey was taking her medication, R. 633, and Abilify helped to drastically reduce her visual hallucinations.  R. 632.  Her GAF then was assessed as a 58.  R. 634.

In January 31, 2013, Stiffey denied suicide ideation, but expressed a passive death wish. R. 627.  She indicated that since taking Abilify her visual hallucinations were very rare.  R. 627. She was prescribed Neurontin for anxiety.  R. 621.  Her GAF at that time was assessed as a 56. R. 629.  On April 4, 2013, her GAF was assessed as a 55, R. 623, her Effexor was increased, R. 624, and her Neurontin was discontinued as she reported no effect from the medication.  R. 624. She denied suicide ideation at that time, but felt overwhelmed and was "scattered and disorganized." R. 621.  Gayle Richardson, MA, assessed Stiffey with a GAF of 56 in March of 2013 and notes indicate continuing issues with panic, anxiety and depression.  R. 649.  Her GAF on June 6, 2013, as indicated by Nurse Rock, was a 59. R. 618.  Her affect was appropriate and her thought process was logical.  R. 617.  Stiffey was planning at that time to host graduation party and baby shower.  R. 616.  Her anxiety was better overall, R. 616, but her inattention and concentration remained unchanged.  R. 616.  She experienced anxiety triggered by crowds, R. 616, and had experienced the previous visual hallucinations. R. 617.  Again, in July of 2013, Gayle Richardson, MA, indicated Stiffey's continuing issues with panic, anxiety and depression and then assessed her with a GAF of 57.  R. 645.  On August 15, 2013, Nurse Rock indicated Stiffey's GAF was assessed as a 56.  R.  613.  Stiffey's affect was appropriate and her thought processes were logical. R. 612-613.   She noted improved depression and anxiety and decrease in visual hallucinations, and denied suicide ideation.  R-613. 612.  She indicated that she enjoyed cooking and crafts but concentration and focus remained a problem R. 611.  Gayle Richardson, M.A., assessed Stiffey with a GAF of 57 on October 9, 2013. R. 642.  On November 14, 2013, Stiffey reported to Nurse Rock that she does not like to go into stores, large groups make her

uncomfortable, and she had suicide ideation.  R. 606-607.  Her affect was constricted, her attention was gained and distracted, but her visual hallucinations were rare and her thought process was logical.  R. 606-607.  Stiffey indicated she did not take her Effexor as prescribed because it made her tired, R. 606, and her Effexor prescription was decreased.  R. 609.

On January 16, 2014, Nurse Rock noted that Stiffey had quit on her own taking the Effexor because it made her tired.  R. 601.  She was then prescribed Wellbutrin, R. 604, which also could help Stiffey with her efforts to stop smoking.  R. 604.  Stiffey's affect was constricted, but her attention was maintained and her thought process was logical.  R. 602.  She did not express suicide ideation, her visual hallucinations were rare, but she expressed having trouble finishing projects and experiencing panic in public, was avoiding large crowds and expressed a passive death wish.  R. 601-602.  Her GAF was assessed at 57 at that time. R. 603.

### 3.  *Opinion Evidence*

The record includes opinion evidence from treating, examining consultative and non-examining consultative sources.

### a.  Treating & Examining Source Opinions

**<u>Dr. Singh.</u>**  Related to her back pain and on the basis of Stiffey's one visit on January 24, 2014 treating with Dr. Singh, R. 557, Dr. Singh completed a "Residual Functional Capacity Questionnaire" dated May 31, 2014, which consisted of twelve separate questions. R. 662-663. Dr. Singh provided on the checklist form that:  Stiffey had low back pain, that her "symptoms associated with [her] impairments" were "constantly" "severe enough to interfere with the attention & concentration required to perform simple work-related tasks," that the side effects of her medications were "tired/dizziness/sleepy;" and hat her prognosis was fair to poor.  R. 662. He further indicated that she could walk less than one block without rest or significant pain; that

she could sit for 15 minutes at one time, could walk for 10 minutes at one time, and could sit for 5 hours out of an 8 hour day; that she needed a job that permitted shifting positions at will, and needed to take an indefinite number of unscheduled fifteen minute breaks during the workday; that she would be absent from work as a result of her impairments more than four times a month; that she could occasionally lift 10 pounds or less, but never 20 pounds or more; and that she had no limitations in repetitive reaching, handling or fingering.  R. 662-663.  Dr. Singh did not, however, indicate any answer to question 8(c) regarding the number of hours Stiffey could stand/walk in an 8 hour workday nor to question twelve posing the question:  "[i]s your patient physically capable of working an 8 hour day, 5 days a week employment on a sustained basis."  R. 663.  Dr. Singh also did not provide any written evaluation with the checklist form.  R. 662-663.  Ultimately, the ALJ accorded "little weight" to Dr. Singh's checklist opinion.  R. 36.

**Dr. Malik.**  State Agency Consultative Examiner, Dr. Mohammad Malik, M.D., examined Stiffey on January 16, 2013, and completed a consultative evaluation with report based on his own physical examination of her, noting Stiffey was able to get off the exam table without difficulty.  R. 523.  In considering her range of motion in numerous areas and detailing same on a range of motion chart, R. 527-528, his examination revealed only a slightly decreased flexion of the lumbar spine.  R. 521, 528.  He also determined that Stiffey had equal reflexes in the knees and ankles and equal muscle strength in her quadriceps and in her hamstrings.  R. 523. Ultimately, Dr. Malik opined that Stiffey could occasionally both lift and carry up to twenty lbs., that she could stand and walk up to four hours in an eight hour workday, that she could sit four hours in a work day, that her pushing and pulling was not limited, R. 525, that she could only occasionally engage in posturals (bending, kneeling, stooping, crouching, balancing, and climbing), R. 526, and that she could not be exposed to heights and moving machinery.  R. 526.

The ALJ gave Dr. Malik's opinion great weight, R. 37, but also determined that Stiffey's ability to sit for a longer period was "slightly more limited due to pain with prolonged sitting." R. 37.

**Nurse Rock.** Stiffey was seen repeatedly by Nurse Rock for mental health issues and medication management at the FCC, beginning in June 24, 2010 through January, 2014. Nurse Rock completed three mental capacity assessments, which were dated September 20, 2012, R. 495, December 26, 2013, R. 553 and February 27, 2014, R. 657, and which were all check the box forms without further report and on which Nurse Rock declined to describe the medical/clinical findings that support her assessment, though requested. R. 495-497, 553-555, 657-659. The September 20, 2012 assessment indicated a marked[4] limitation in the ability to understand and remember detailed instruction; carrying out detailed instructions; maintaining attention and concentration for extended periods; and completing a normal workweek without interruption due to psychologically based symptoms. R. 495-496. It indicated a moderate limitation: in the ability to perform activities within a schedule, maintain attendance, and be punctual within customary tolerances; the ability to work in coordination with or in proximity to others without distraction; the ability to compete a normal workday without interruptions from psychologically based symptoms; the ability to perform at a consistent pace; the ability to accept instructions and respond appropriately to criticism from supervisors; the ability to get along with coworkers without distracting them or exhibiting behavioral extremes; the ability to respond appropriately to changes in work setting the ability to travel to unfamiliar places or use public transportation; and the ability to set realistic goals or make plans independent of others. The form also provided that Stiffey likely would miss work two times a month. R. 496.

---

[4] "A marked limitation is one that seriously interferes with a claimant's ability to 'function independently, appropriately, effectively, and on a sustained basis.'" Morris v. Barnhart, 78 F. App'x. 820 (3d Cir. 2003)(quoting 20 CFR pt. 404, subpt. P, app. 1 § 12.00(C) (1999)).

The December 26, 2013 assessment was similar to the September 20, 2012 assessment, but then indicated a <u>marked</u> as opposed to <u>moderate</u> limitation: in the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; in the ability to work in coordination with or in proximity to others without being distracted by them; the ability to complete a normal workaday without interruptions from psychologically based symptoms; the ability to perform at a consistent pace with a standard number and length of rest periods; and the ability to set realistic goals or make plans independently of others. R. 553-554. It indicated a <u>moderate</u> as opposed to <u>slight</u> limitation in the ability to interact appropriately with the general public, maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. R. 554. It indicated a <u>slight</u> as opposed to <u>moderate</u> limitation in the ability to accept instruction and respond appropriately to criticism from supervisors. R. 554. Where the December 26, 2013 form requested how many absences Stiffey likely would have in a month, Nurse Rock indicated "unknown." R. 554.

Finally, the February 27, 2014 assessment was similar to the December 26, 2013 assessment, but indicated an <u>extreme</u> as opposed to <u>marked</u> limitation: in the ability to carry out detailed instructions and to maintain attention and concentration for extended periods; in the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; in the ability to work in coordination with or in proximity to others without being distracted by them; in the ability to complete a normal workday without interruptions from psychologically based symptoms, to complete a normal workweek without interruptions from psychologically based symptoms, and to set realistic goals or make plans independently of others; a <u>marked</u> as opposed to <u>moderate</u> limitation in: the ability to sustain an ordinary routine without special supervision and to travel in unfamiliar places or use public

transportation  R. 657-659.   It indicated a <u>moderate</u> as opposed to <u>slight</u> limitation in the ability to accept instructions and respond appropriately to criticism from supervisor.  R. 658.  It also indicated a <u>slight</u> as opposed to <u>marked</u> limitation in the ability to understand and remember detailed instruction.  R. 657.  The form provides that Nurse Rock anticipated Stiffey likely would miss work "4+" times a month.  R. 658.   The ALJ gave little weight to Nurse Rock's check the box opinions. R. 37.

**<u>Dr. Charles Kennedy, PhD</u>**.  Dr. Kennedy completed a mental consultative examination of Stiffey on November 8, 2012.  R. 498.  Dr. Kennedy diagnosed Stiffey with panic disorder with agoraphobia, and major depressive disorder.  R. 503.  Dr. Kennedy's notes in support of his opinion indicated that Stiffey arrived on time with fair appearance and hygiene, R. 498, responded appropriately to his request, was well-mannered and displayed fair self-sufficiency. R. 498-499.   Dr. Kennedy observed that Stiffey maintained good eye contact, her psychomotor activity and speech was normal, her affect was appropriate with limited range of expression, her emotional expression was appropriate to thought content and situation, she put forth good effort to answer questions, she sustained attention throughout the entire process of his exam, her stream of thought was goal-directed, and her abstract thinking was good.  R. 501.  Stiffey did not reveal any delusions or perceptual disturbances.  R. 501.  She also expressed that she has a passive death wish, lacks motivation, sleeps excessively, has trouble concentrating, and isolates herself. R. 499.  Dr. Kennedy assessed that Stiffey had <u>marked</u> restrictions in interacting appropriately with the public, and <u>moderate</u> restrictions interacting appropriately with a supervisor and co-workers, responding appropriately to work pressures in a usual work setting and to changes in a routine work setting, and in understanding, remembering and carrying out detailed instructions.

R. 506.   Dr. Kennedy assessed Stiffey with a GAF of 55 and indicated a "fair" prognosis.  R.

503.   The ALJ gave significant weight to Dr. Kennedy's opinion.  R. 37.

**GAF Scores**.  As indicated <u>supra</u>, (p. 6 at n.3), GAF scores are considered medical

opinion evidence by the Social Security Administration.  Stiffey points out in her brief that her

GAF scores as assessed by her treatment providers remained at 65 throughout 2011, R. 444, 452;

(ECF 13 at 7), which connotes mild difficulty in functioning at that time.  Her GAF scores from

her treatment providers at the FCC ranged from 55 to 58 in 2012.  Similarly, in 2013, her

treatment providers at the FCC assessed her with GAF scores from 55 to 59.  Finally, in 2014,

she was assessed with a GAF score of 57 at the FCC.   Dr. Kennedy, the consultative examiner

assessed Stiffey's GAF score to be 55 on November 8, 2012. R. 503.  Thus, Stiffey's GAF scores

from 2011 connoted mild difficulty in social, occupational or school functioning, and her GAF

scores from 2012 through 2014 connoted moderate difficulty.  The ALJ gave great weight to the

GAF scores assessed throughout Stiffey's treatment record.  R. 38.

### b.  Non-Examining Source Opinions

**Dr. Nghia Van Tran, MD**.  The state agency non-examining medical consultant, Dr.

Van Tran completed a physical RFC assessment on March 27, 2013.  R. 115-117, 129-131.  Dr.

Van Tran indicated that Stiffey would be limited to unskilled work and that she had the

maximum sustained work capability for light work with additional restrictions, R.  133, that she

occasionally could lift 20 lbs. and frequently could lift 10 lbs., that she could stand and/or walk

with normal breaks for about 6 hours in an 8 hour workday, that she could sit about 6 hours in an

8 hour workday, that her push/pull was unlimited except for the lifting and carrying weight

restrictions, that she could occasionally engage in posturals, and that she must avoid even

moderate exposure to extreme cold and heat, wetness, humidity, fumes, odors, gases, and poor

ventilation. R. 115-116. Dr. Van Tran's assessed RFC partially adopted Dr. Malik's opinion. R. 117. The ALJ gave significant weight to Dr. Van Tran's opinion, however, he also found that the evidence supported additional limitations accounted for in his ultimate RFC. R. 38.

**Dr. Sharon Tarter, PhD**. The state agency non-examining psychological consultant, Dr. Tarter completed a psychiatric review technique and mental RFC assessment on December 4, 2012. R. 113-114, 117-119, 127-128, 131-133. Dr. Tarter's psychiatric review technique indicated that Stiffey suffered from anxiety disorder and affective disorder. R. 113. Dr. Tarter indicated mild restriction in activities of daily living, moderate difficulties in social functioning, and moderate difficulties in maintaining concentration, persistence and pace ("CPP"). R. 114. As more specifically indicated in the mental RFC, Dr. Tarter indicated that Stiffey had moderate limitations in the ability to carry out detailed instructions and in maintaining attention and concentration for extended periods, but no other significant limitations. R. 117. Dr. Tarter also indicated that Stiffey had a marked limitation in interacting appropriately with the general public, R. 118, and moderate limitation in the ability to accept instructions and respond appropriately to criticism from supervisors, and in the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. R. 118. Ultimately, Dr. Tarter indicated that Stiffey's limitations did not preclude her "from performing the basic mental demands of competitive work on a sustained basis." R. 118. Dr. Tarter also adopted Dr. Kennedy's assessment. R. 118. The ALJ found Dr. Tarter's opinion to be consistent with the GAF scores above 55, Stiffey's activities of daily living, and her treatment history, which included medication and therapy but no hospitalization. The ALJ gave significant weight to Dr. Tarter's opinion. R. 38.

### D. Administrative Hearing Testimony

Stiffey testified at the hearing before the ALJ regarding her condition and daily activities. She also explained that she did not have insurance from February 2014 until just before the June 26, 2014 hearing because she "didn't send in the right paperwork." R. 50. She testified that she drives daily, but does not drive on extended trips, just going to the store and back. R. 50. In the months prior to the hearing, Stiffey also occasionally rode in the car with a friend on the friend's paper route to keep them company. R. 53.

Stiffey explained that she cannot function on a day-to-day basis because her family has to sometimes help her get her shoes and pants on, she has her shoes pre-tied so she can slip them on, she cannot wash dishes or do laundry because standing too long or sitting too long bother her and causes her excruciating pain. R. 53. She indicated that too long meant 10 to 15 minutes. R. 54. She walks but has to take breaks after a half of a block. R. 64. She goes grocery shopping or to the mall, but added that she needs to have a bench close by or a wheelchair. R. 54. She sometimes has trouble sitting, requiring her to get up and down, unless she takes medication such as hydrocodone that makes her tired. R. 54-55. She described the pain as in her back, legs, knees and feet, radiating up and down her back into her hips, down her legs and into her toes. R. 54. She treats her pain with pain medicine, muscle relaxers, heat, ice and exercise. R. 55.

Stiffey described her day as: "consist[ing] of getting up, sitting down, laying down, getting up, moving—[trying] to move around as much as [she] can. But [finding herself] laying around a lot, now more than ever." R. 55. She is frustrated by having to rely on everyone else. R. 55. She also testified that on a typical day, she will go the bathroom, walk outside to see what's going on, then come inside and sit down and maybe turn on the TV or the computer, check her email, shift around trying to do "a little bit of this and a little bit of that" as much she can, trying to "get a few dishes washed, or straighten up a little bit, or dust, or wipe off the

counter, or something; anything to help [her] husband." R. 59-60. She tries to help but her husband does most of the chores, including cooking. R. 60. She cooks simple limited things, unless she can sit, R. 60, and she tries to straighten things up because they are all on different schedules. R. 61. She shops for groceries, but quickly, R. 61, and when she shops by herself she has the store put the bags in her car. R. 61. She goes out to eat at restaurants and has friends and family visit. R. 61-62. She babysits her grandson but has someone to help lift and carry him because he weighs 20 pounds. R. 62. She also sits outside and talks on the phone. R. 65.

She was supposed to host a baby shower, but her daughter-in-law went into labor and was delivering the baby during the shower and Stiffey was at the hospital for the labor and delivery. R. 62-63. A year before the hearing, she hosted a high school graduation party for her daughter. R. 63. She planned the party, assigned jobs, and called and made the arrangements for it. R. 63. She likes to do crafts, but indicated that she does not complete them as she gets frustrated and can't focus to finish them because of her issues with attention. R. 63-64, 71.

Responding to questions by her counsel, she testified that she regularly and usually takes naps in the afternoon from three to five hours a day because the medication makes her tired and because she does not sleep more than three to five hours at a time. R. 65-66. She also testified that she needs to recline or lie down for an hour to two hours at a time due to pain every day for four to five hours. R. 67. She testified that she has a lot of days a month, at least 20 or 25, where her pain is so great it limits her ability to wash dishes, do laundry, vacuum, cook a nice dinner, or "chase after" her grandson. R. 68.

According to her testimony, she had back surgery in 2006 and 2008, which helped for a while but then the pain came back and she was told at one point that her next option was to have

a fusion surgery. R. 55, 56, 71. Since 2010 her pain has gotten worse because she has more pain down her legs. R. 70. She tried physical therapy but thought it made her pain worse. R. 70. She testified that sometimes the pain is bad, as her legs were hurting really bad at the hearing, but sometimes "it's not as bad as other times . . . [but it] never goes away." R. 56. She has a hard time falling asleep because of the pain unless she takes medication. R. 59.

She sometimes has trouble breathing when she walks a lot or is in the real hot heat. R. 56. Fumes and odors, however, do not bother her or affect her breathing. R. 56. She used to smoke over two packs of cigarettes a day, but is trying to quit and indicated at the time of the hearing that she was down to less than half a pack a day, which helped her breathing. R. 69. She previously took Chantix and now uses Wellbutrin to help with smoking cessation. R. 69.

Stiffey testified that she takes thyroid medicine because of thyroid cancer and removal, but it does not affect her ability to function. R. 57. Regarding gastrointestinal issues, she mostly has had problems with her stomach when she eats and has gone through periods where everything she eats make her run to the bathroom, so that she stays near a bathroom. R. 57. She takes Bentyl, which is helping her but she still has "flare ups" when her nerves are on edge or she "eats something [she] shouldn't eat." R. 57-58. She testified that it "really bothers [her] being around a bunch of people," resulting in her being unable to function, and that she has panic attacks, and sees and hears things not there," R. 58, but that her condition has improved as long as she is on the medication, although it makes her tired. R. 59. Stiffey did not feel that she could work a full time job even if it was sitting at a table and working with paper because she would need to be up and down, moving around, would need to be in the bathroom, and because her attention would not be constantly on the work like it should be. R. 66-67.

**E. ALJ's Determination.**

The ALJ determined that Stiffey was not disabled under § 1614(a)(3)(A) of the Social Security Act from November 19, 2006 through September 5, 2014. R. 39. The ALJ concluded that Stiffey had the following <u>severe</u> impairments: degenerative disc disease of the lumbar spine, sciatic syndrome, chronic obstructive pulmonary disease ("COPD"), irritable bowel syndrome, obesity, bipolar disorder, major depressive disorder, panic disorder with agoraphobia, and attention deficit hyperactivity disorder. R. 27 (citing 20 C.F.R. §§ 404.1520(c) and 416.920(c)). He further determined that Stiffey had the following <u>non-severe</u> impairment: hypothyroidism, which is controlled by medication, and regarding which Stiffey has not alleged and the evidence does not show any limitations in Stiffey's ability to perform basic work-related activity. R. 28, The ALJ also found that her impairments singly or in combination did not meet or medically equal the severity of a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1(20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), § 416.925 and § 416.926). R. 28-29.

As to Stiffey's RFC, the ALJ found that she has the RFC to perform sedentary work with the following restrictions:

> she can lift and carry ten pounds occasionally; she can stand or walk for two hours of an eight-hour workday; she can sit for six hours of an eight-hour workday; she requires a sit/stand option every 30 minutes; she can never climb ladders, ropes or scaffolds; she can occasionally climb ramps and stairs; she can occasionally balance, stoop, kneel, crouch, and crawl; she can occasionally push/pull with bilateral upper extremities; she must avoid exposure to extreme cold, extreme heat, and humidity; she can have no exposure to hazards such as heights and moving machinery; she must have access to a restroom; she is able to perform simple, routine, repetitive tasks; she requires a low stress work environment, defined as occasional simple decision making and occasional changes in the work setting; she cannot perform work in a fast paced environment; and she can have occasional interaction with coworkers and supervisors, and no interaction with the public.

R. 29.

In ruling, the ALJ also made the following credibility determination:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision.

R. 30**.**

The ALJ determined that Stiffey did not have the RFC to perform her past relevant work, R. 27, and ultimately determined that Stiffey "has not been under a disability, as defined in the Social Security Act, from May 10, 2010, through the date of this decision." R. 39. Regarding his ultimate ruling that Stiffey is not disabled under the Act, ALJ Wood further stated:

> [b]ased on the testimony of the vocational expert, the undersigned concludes that, considering the claimant's age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in in significant numbers in the national economy. A finding of "not disabled" is therefore appropriate under the framework of [Medical-Vocational rule 201.28].

R. at 30**.**

## III. <u>Standard of Review</u>

The Congress of the United States provides for judicial review of the Commissioner's denial of a claim for benefits. 42 U.S.C. § 405(g). This Court's review is plenary with respect to all questions of law. <u>Schaudeck v. Commissioner of Social Security Administration</u>, 181 F.3d 429, 431 (3d Cir. 1999). With respect to factual issues, the court must determine whether or not there is substantial evidence which supports the findings of the Commissioner. 42 U.S.C. § 405(g). "Substantial evidence has been defined as 'more than a mere scintilla,'" <u>Plummer v. Apfel</u>, 186 F.3d 422, 427 (3d Cir. 1999) (quoting <u>Ventura v. Shalala</u>, 55 F.3d 900, 901 (3d Cir. 1995)), and "does not mean a large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" <u>Pierce v. Underwood</u>, 487 U.S. 552, 565 (1988) (quoting <u>Consolidated Edison Co. v. NLRB</u>, 305 U.S.

197, 229 (1938)). This standard also has been referred to as "less than a preponderance of evidence but more than a scintilla," Burns v. Barnhart, 312 F.3d 113, 118 (3d Cir. 2002), and does not permit the reviewing court to substitute its own conclusions for that of the fact-finder. See id; Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001) (reviewing whether the administrative law judge's findings "are supported by substantial evidence" regardless of whether the court would have differently decided the factual inquiry). Nevertheless, "[a]n ALJ must explain the weight given to physician opinions and the degree to which a claimant's testimony is credited." Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 362 (3d Cir. 2011). The ALJ's decision will not be reversed if supported by substantial evidence and decided according to correct legal standards. Id. To determine whether a finding is supported by substantial evidence, the district court must review the record as a whole. 5 U.S.C. § 706(1)(F).

**IV. Five Step Evaluation Process for Determining Disability under the SSA**

Under the SSA, the term "disability" is defined as the:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months ...

42 U.S.C. § 423. A person is unable to engage in substantial activity when she:

> is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for [her], or whether [she] would be hired if [she] applied for work....

42 U.S.C. § 423(d)(1)(A) & (d)(2)(A).

In determining whether a claimant is disabled under the SSA, a sequential evaluation process is applied. 20 C.F.R. § 416.920(a). See McCrea v. Commissioner of Social Security, 370 F.3d 357, 360 (3d Cir. 2004). The evaluation process proceeds as follows. At step one, the

Commissioner must determine whether the claimant is engaged in substantial gainful activity for the relevant time periods; if not, the process proceeds to step two. 20 C.F.R. 20 C.F.R. § 416.920(b). At step two, the Commissioner must determine whether the claimant has a severe impairment or a combination of impairments that is severe. 20 C.F.R. § 416.920(c). If the claimant has a severe impairment, the Commissioner must then determine at step three whether the impairment or combination of impairments meets or equals the criteria of an impairment listed in 20 C.F.R., part 404, Subpart P, Appendix. 1. 20 C.F.R. § 416.920(d). If a listing is not met, the Commissioner then must determine the claimant's residual functional capacity ("RFC")--that is, the claimant's ability to do physical and mental work activities on a sustained basis despite limitations from her impairments. 20 C.F.R. § 416.920(e). At step four the Commissioner must determine whether the claimant's impairment or impairments prevent her from performing her past relevant work. 20 C.F.R. § 416.920(f). If so, the Commissioner must determine, at step five, whether the claimant can perform other work which exists in the national economy, considering her residual functional capacity and age, education and work experience. 20 C.F.R. § 416.920(g). See also McCrea, 370 F.3d at 360; Sykes v. Apfel, 228 F.3d 259, 262-63 (3d Cir. 2000).

## V. Discussion

Stiffey seeks to have the agency decision vacated and the matter remanded for further administrative proceedings, arguing that: 1) the ALJ's RFC finding was unsupported by substantial evidence and was the product of legal error, namely that the ALJ erred in the weight given to certain opinion evidence; and 2) the ALJ's credibility determination was not supported by substantial evidence and was the product of legal error. (ECF No. 13 at 1).

### A.  The ALJ did not err in crediting opinion evidence

*1. Challenge Regarding Dr. Singh and Dr. Malik*

In according little weight to Dr. Singh's opinion, the ALJ specifically indicated that the objective medical evidence did not establish an impairment that would preclude Stiffey from sitting or walking for more than 10 to 15 minutes, the documented observations of her pain behaviors did not support the 15 minute sitting limitation, and the treatment history did not reflect a severity or frequency of pain complaints that would prevent Stiffey from showing up for work four or more days a month.  R. 36.  Nonetheless, the ALJ's RFC limited Stiffey to sedentary work, lifting and carrying only occasionally 10 pounds, permitting a sit/stand option every 30 minutes, requiring her only to stand or walk for two hours and sit for six hours of an eight-hour workday, and requiring access to a bathroom.  R. 29.

Citing Morales v. Apfel, 225 F.3d 310, 317 (2000), 20 C.F.R. §§ 404.1527(c)(2), Fargnoli v. Halter, 247 F.3d 34, 42-44 (3d Cir. 2001), (ECF 13 at 18-20), Stiffey argues that the ALJ failed to properly credit and consider the opinion of Dr. Singh, asserting that the ALJ's analysis was cursory, did not adequately examine the factors in assessing the treating physician's opinion, and instead improperly gave greater weight to Dr. Malik's opinion.  The Commissioner responds that the ALJ reasonably assessed Dr. Singh's opinion as deserving little weight, (ECF 19 at 20), and adequately articulated his reasoning in discounting the opinion. (ECF 19 at 22). The Court agrees with the Commissioner.

Great or controlling weight may be given to a treating physician's opinion where the opinion is based on ongoing observation over a prolonged period of time, provides a sufficient explanation to support the opinion, is well-supported by clinical and laboratory evidence, and is not inconsistent with other substantial evidence of record.  Brownawell v. Comm'r of Soc. Sec., 554 F.3d 352, 355 (3d Cir. 2008); Jones v. Sullivan, 954 F.2d 125, 129 (3d Cir. 1991)

(conclusory opinions of even long-time treating physicians unsupported by medical evidence and failing to explain why longstanding ailments subsequently incapacitated claimant not controlling); Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000) (An ALJ may reject even a long-time treating physician based on contradictory medical evidence); 20 C.F.R. §§ 404.1527(c), 416.927(c)(2).  Check the box or fill in the blank forms, however, regardless if completed by a treating physician, are not entitled to controlling weight, are weak evidence at best, and when not accompanied by a thorough written report are considered suspect.  Mason v. Shalala, 994 F.2d 1058, 1065 (3d Cri. 1993) ("Form reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best" and the reliability of such reports not accompanied by a thorough written report is considered suspect.) (citing Brewster v. Heckler, 786 F.2d 581, 585 (3d Cir.1986); Green v. Schweiker, 749 F.2d 1066, 1071, n. 3 (3d Cir. 1984)). Even where an opinion is not expressed as a check the box form and is from a long-standing treating physician, if it conflicts with the opining physicians' own notes or other portions of the medical record, the ALJ may appropriately use those bases in declining to give controlling or great weight to the opinion. Ridenbaugh v. Barnhart, 57 F. App'x.101, 105 (3d Cir. 2003).

Stiffey's challenge generally ignores that Dr. Singh's opinion was based on a single visit, rather than any continuing observation of Stiffey, and that Dr. Singh provided only a check the box form with no accompanying report.   Moreover, the ALJ explained that Dr. Singh's own examination of Stiffey and treatment notes from her single visit with him on January 24, 2014, revealed that she complained of low back pain and intermittent diarrhea, but that she had normal gait and station, no acute distress, no abdominal tenderness and normal bowel sounds.  R. 31, 32, 557, 558.  Stiffey claims that the ALJ only provided a single conclusory reason for affording little weight to Dr. Singh's opinion--that the evidence does not support the opinion.  (ECF 13 at

17).  To the contrary, the ALJ explained that the treatment records and treatment history did not

support the opinion that Stiffey could only sit for 15 minutes and could not walk for more than

15 minutes, and the treatment history did not reflect pain complaints of a severity or frequency

preventing her from showing up for work more than four times a month.  R. 36.  Nevertheless,

the ALJ's RFC finding provided her a sit/stand option every 30 minutes, limited her to lifting

and carrying 10 lbs., and limited her to standing and walking only 2 hours in an 8 hour workday.

As urged by the Commissioner, (ECF 19 at 23), an ALJ may choose whom to credit.

Mason v. Shalala, 994 F.2d 1058, 1066 (3d Cir. 1999).

> In evaluating medical reports, the ALJ is free to choose the medical opinion of
> one doctor over that of another. Cotter v. Harris, 642 F.2d 700, 705 (3d Cir.1981).
> However, "[w]hen a conflict in the evidence exists, the ALJ may choose whom to
> credit but cannot reject evidence for no reason or for the wrong reason. The ALJ
> must consider all the evidence and give some reason for discounting the evidence
> she rejects." Plummer [v. Apfel], 186 F.3d [422], 429 (internal citation omitted).

Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 505–06 (3d Cir. 2009).  "[S]tate agent opinions merit

significant consideration as well."  Chandler, 667 F.3d at 361.  Importantly, the ALJ here did not

"rubberstamp" any of the state agency consultant's opinions, Chandler, 667 F.3d at 362, and

although he gave their opinions "significant weight" R. 38, the ALJ indicated that additional

limitations were supported and accommodated those limitations in his ultimate RFC.  R. 38.

Stiffey also argues that where the ALJ relies *solely* upon a consultative examiner's report

that did not benefit from a review of the claimant's records, he commits reversible error.  (ECF

13 at 21) (citing Adesina v. Astrue, No. 12-CV-3184, 2014 WL 5380938 (E.D. N.Y. Oct. 22,

2014) (finding consultative examiner was not entitled to significant weight where he did not

consult treatment records or diagnostic studies and only conducted the most basic clinical

analysis)).  Stiffey then challenges the great weight given by the ALJ to Dr. Malik's January

2013 opinion based on the asserted argument that Dr. Malik's opinion "does not benefit from the

entire record and [he] did not based his opinion upon a review of [Stiffey's] records." (ECF 13 at 18). Other than the timing of Dr. Malik's examination, Stiffey does not point to record evidence in support of her argument.

The regulations do provide regarding consultative examination, that "[w]e will also give the examiner any necessary background information about your condition." 20 C.F.R. § 404.1517. The regulations do not, however prohibit the ALJ from relying on state agency opinions issued prior to subsequently generated medical records as "there is always some time lapse between the consultant's report and the ALJ hearing and decision. Only where additional medical evidence is received that *in the opinion of the* [ALJ] . . . may change the State agency medical consultant's finding . . . is an update to the report required." Chandler, 667 F.3d at 361 (citing SSR 96-6 (July 2, 1996)(emphasis in original)). Moreover, it does not follow that a lack of specific reference in a report to other treatment and medical records means the examiner did not have or consider them. Torres v. Barnhart, 139 F. App'x 411 (3d Cir. 2005) (noting that the record was not clear that the consultative examiner did not have claimant's file although examiner did not reference records in his report and indicating that there was no evidence that consulting examiner could not render accurate assessment without additional materials); Lilly v. Barnhart, Civ. A. 02-8322, 2004 WL 875545, at *5 (E.D. Pa. March 22, 2004) (rejecting claimant's argument that ALJ gave consultative examiner's opinion too much weight because he "apparently did not have copies of prior treatment records and test results indicating that Plaintiff suffered from acute lumbar radiculopathy" based on the mere fact that the consultative examiner did not reference them in his written evaluation and where consultative examiner conducted a physical exam and supported his diagnosis with detailed findings). Here the written report accompanying Dr. Malik's opinion reveals that he both referenced and considered her past back

and thyroid surgeries, sciatica, chronic low back pain, COPD, medications, and that he also performed his own thorough examination of her.  R. 522.

In sum, the ALJ's decision to afford little weight to Dr. Singh's check the box form provided without explanation and based on a single visit is not error, <u>Mason v. Shalala</u>, 994 F.2d at 1065;  <u>Brewster v. Heckler</u>, 786 F.2d at  585; <u>Green v. Schweiker</u>, 749 F.2d at 1071, n. 3, nor is his decision to afford Dr. Malik's opinion great weight.

## 2.  *Challenge Regarding Nurse Rock*

Stiffey challenges as error that the ALJ gave little weight to Nurse Rock's opinions, and argues that the ALJ did not assess her opinion evidence in accordance with regulations.  (ECF 13 at 19).   First and foremost, as pointed out by the ALJ and acknowledged by Stiffey, Nurse Rock is not considered an acceptable medical source under the regulations and her opinion does not constitute a medical opinion. 20 C.F.R. § 404.1513(a); R. 37.  Instead, she is classified under "other sources," "whose opinions the ALJ <u>may use</u> to show the severity of an impairment and how it affects a claimant's ability to work. 20 C.F.R. § 416.913(d)."  <u>Hazlett v. Colvin</u>, No. 2:13-CV-00538, 2014 WL 3845730, at *8 (W.D. Pa. Aug. 4, 2014) (emphasis added); <u>see</u> <u>also</u> <u>Chandler</u>, 667 F.3d at 361–62 ("Instead, the ALJ found persuasive and incorporated DeWees's opinion that Chandler cannot sit for more than thirty minutes at a time, even though the ALJ was not required to consider DeWees's opinion at all because, as a nurse practitioner, she is not an 'acceptable medical source[ ].'" *See* 20 C.F.R. § 404.1513(a).").

Stiffey erroneously refers to Social Security Ruling 06-03p as a regulation; however it is a ruling.  Nevertheless, the policy interpretation ruling addresses how the Social Security Administration "consider[s] sources who are not "acceptable medical sources."  SSR 06-03p (Purpose).  That ruling specifies that the regulations *do not* address factors that must be applied

to opinion evidence from "other sources," such as Nurse Rock, but also indicates that the factors that explicitly apply to assessing medical opinions from acceptable medical sources "<u>can be applied</u> to opinion evidence from 'other sources.'" SSR 06-3p (emphasis added). As argued by Stiffey, SSR 06-03 provides that "it would be <u>appropriate</u> to consider such factors as the nature and extent of the relationship between the source and the individual, the source's qualifications, the source's area of specialty or expertise the degree to which the source presents relevant evidence to support his or her opinion, whether the opinion is consistent with other evidence, and any other factors that tend to support or refute the opinion." SSR 06-03 (emphasis added); <u>see also</u> <u>Desmond v. Colvin</u>, No. CIV.A. 13-1078, 2014 WL 1248164, at *2 (W.D. Pa. Mar. 26, 2014). The ruling further provides that:

> [a]lthough there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator generally should explain the weight given to opinions from these "other sources," or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case.

SSR 06-03p.

Stiffey claims the ALJ simply brushed aside appropriate analysis of Nurse Rock's opinion and merely offered the conclusory statement that he considered her opinion in accordance with those regulations. (ECF 13 at 20). The ALJ did state specifically that he evaluated Nurse Rock's opinions, as opinion from a non-acceptable medical source that does not constitute a medical opinion, "in accordance with those regulations, under guidance set forth for weighing opinions from treatment providers who are not acceptable medical sources." R. 37. The ALJ, however, also specifically noted Nurse Rock's relationship with Stiffey and her knowledge and experience in the mental health field. R. 37. The ALJ's decision further detailed

Nurse Rock's involvement in Stiffey's care, when discussing medical management, treatment notes, mental status findings, and GAF scores assessed with her treatment at the FCC.  R. 33-36.

Stiffey argues that in giving Nurse Rock's opinion little weight, the ALJ failed to consider the treatment notes regarding Stiffey's limitations with concentration.  (ECF 13 at 20). Rather than ignoring the issue of concentration as suggested by Stiffey, the ALJ in reviewing the record specifically noted Stiffey's complaints of poor concentration, including at her initial visit at the FCC, but also indicated that her mental status exam findings indicated on several occasions that she maintained attention.  R. 33.  Likewise, the ALJ considered that the mental status examination findings in the treatment records from February 2011 revealed that she maintained attention, R. 34, from April 2011 revealed distracted attention, R. 34, from August 2011 revealed improvement and otherwise normal mental exam findings, R. 34, from November 2012 revealed she maintained attention, R. 35, from June of 2013 revealed distracted attention, R. 35, from August 2013 revealed distracted attention and that she continued to report problems with concentration and focus, R. 35, from November 2013 revealed distracted attention, R. 36, and from January 2014 revealed reported difficulty finishing projects, R. 36.  The ALJ noted as well her medical management and improvement with medicine compliance throughout that time period.  R. 33.  Moreover, the ALJ's RFC finding limited Stiffy to simple, routine, repetitive tasks, with low stress with occasional simple decision making, only occasional changes in the work setting and no fast-paced production environment, occasional interaction with co-workers and supervisors.  The Court of Appeals for the Third Circuit has held that an RFC limited to "simple, routine, repetitive work" or "simple, routine tasks" accounts for moderate deficiencies in concentration, persistence and pace.  Burns, 312 F.3d 113, 123 (3d Cir. 2002); Najmi-Nejad v. Barnhart, 75 F. App'x 60, 64 (3d Cir. 2003); McDonald v. Astrue, 293 F. App'x. 941, 946-947

(3d Cir. 2008).  Thus, Stiffey's limitation in concentration, persistence and pace as found by the ALJ and as supported by the record was accounted for in the ALJ's RFC and the challenge based on Nurse Rock's check the box opinions is rejected.

As with Dr. Singh's opinion, that the ALJ gave little weight to Nurse Rock's check the box opinions is not error.  The ALJ based his decision on the treatment notes from the FCC, including Nurse Rock's treatment notes, the mental status exam findings, Stiffey's treatment history, GAF scores, and Stiffey's activities of daily living, including her self-report.  R. 37.  For example, Nurse Rock's treatment records and the records from the FCC indicated that Stiffey's mental status examination findings were mostly normal, R. 33-37 (noting Euthymic mood, appropriate behavior, logical and unremarkable though content on multiple occasions), except for the construction in affect at times and depressed mood, R. 36-37, and her GAF scores remained at 55 and above, ranging from 55 to 65 from 2010 to 2014.   The ALJ considered and evaluated Nurse Rock in accordance with the requirements of SSR 06-03p, and considered Dr. Kennedy's opinion, as well as the GAF scores throughout in assessing her RFC.

In sum, the Court concludes that the ALJ's decision to afford little weight to the "other source" opinions of Nurse Rock in the check the box forms is supported by substantial evidence.

### B.  Substantial Evidence supports the ALJ's Credibility Determination

Stiffey argues that the ALJ's credibility analysis fails and his finding that Stiffey was not fully credible, R. 30,  is not supported by substantial evidence because he did not properly assess her complaints of pain and psychological symptoms.  (ECF 13 at 23-24).  Specifically, she asserts that he failed to explain his finding, "did not offer an explicit analysis of the regulatory factors for assessing such subjective complaints," and did not explain how they were "inconsistent with any treatment notes." ([ECF 13 at 21-22).   Admitting, however, that the ALJ

"carefully examin[ed] each of Plaintiff's complaints of disabling limitations, and examining the support for them in the record," Stiffey nevertheless argues that the ALJ improperly engaged in only a cursory analysis of Stiffey's credibility and failed "to identify those treatment records inconsistent with her subjective complaints." (ECF 13 at 23).

"An ALJ must explain the degree to which a claimant's testimony is credited." Chandler, 667 F.3d at 362.

> In evaluating whether a plaintiff's statements are credible, the ALJ will consider evidence from treating, examining and consulting physicians, observations from agency employees, and other factors such as the claimant's daily activities, descriptions of the pain, precipitating and aggravating factors, type, dosage, effectiveness, and side effects of medications, treatment other than medication, and other measures used to relieve the pain. 20 C.F.R. § 404.1529(c); SSR 96–7p. . . . . [The Court] must defer to the ALJ's credibility determinations, unless they are not supported by substantial evidence. Smith v. Califano, 637 F.2d 968, 972 (3d Cir.1981); Baerga v. Richardson, 500 F.2d 309, 312 (3d Cir.1974), cert. denied, 420 U.S. 931, 95 S.Ct. 1133, 43 L.Ed.2d 403 (1975).

Splitstone v. Colvin, No. CIV.A. 15-371, 2015 WL 5825536, at * 3 (W.D. Pa. Oct. 6, 2015).

"Although any statements of the individual concerning his or her symptoms must be carefully considered, SSR 96-7pm (July 2, 1996), the ALJ is not required to credit them." 667 F.3d at 363 (citing 20 C.F.R. §404.1529(a)). "In concluding that some or all of a claimant's testimony is not credible, the ALJ may rely on discrepant medical evidence and the claimant's inconsistent statements." Jones v. Astrue, 2012 WL 3279256 at * 2 (E.D. Pa. 2012). The "[i]nconsistencies in a claimant's testimony or daily activities permit an ALJ to conclude that some or all of the claimant's testimony about [her] limitations or symptoms is less than fully credible." Weber v. Colvin, 2016 WL 3922648, at *6 (W.D. Pa. July 20, 2016) (citing Burns, 312 F.3d at 129–30); see also Seaman v. Social Security Administration, 321 F. App'x. 134, 135-136 (3d Cir. 2009) (upholding determination based on comparison with medical evidence and self-report of activities of daily living). A claimant's course of treatment is an appropriate

basis on which to assess credibility as well. <u>Weber</u>, 2016 WL 3922648, at *6. <u>See</u> <u>also</u> <u>Hartranft</u>

<u>v. Apfel</u>, 181 F.3d 358, 362 (3d Cir. 1999) (allegations not fully credible where inconsistent with

medical evidence, description of daily activities and rehabilitation and medical regimen).

In <u>Kent v. Schweiker</u>, 710 F.2d 110, 115, 116 (3d Cir. 1983), relied on by Stiffey, the

ALJ's credibility determination was not supported by substantial evidence where the ALJ

dismissed medical evidence in support of the claimant's complaints of pain, then considered the

lack of evidence resulting as evidence in support of the contrary position, and finally based his

credibility finding on claimant's failure to visit physicians more frequently. 710 F. at 116. The

ALJ here, however, detailed legitimate considerations in assessing Stiffey's credibility and his

credibility determination rested on consideration of the entire case record, R. 30-38, including

Stiffey's testimony; her wide range of activities of daily living, R. 28, 36; the medical record,

with treatment notes reflecting on numerous occasions she reported no pain on exam, R. 30

(noting that at examinations with her primary care physician, Dr. Jeffrey Reyer, DO, in

November 2010, January 2011 and May 2011, she denied any back pain, R. 30, 361, 369, 373),

that at her 2014 examination by Dr. Singh, her gait and station were normal, R. 31, at her 2013

examination by Dr. Malik objective findings other than a slightly decreased flexion of the lumbar

spine were normal; MRI showed moderate degenerative disk disease but no recurrent disc

protrusion with nerve impingement, R. 31; that her treatment records did not document pain

behaviors that would preclude Stiffey from sitting or walking more than fifteen minutes, R. 36,

her numerous normal or unremarkable mental status findings, R. 33-37, and GAF scores at 55

and above reflecting moderate difficulties. R. 37.

The ALJ thus detailed legitimate and appropriate considerations in assessing Stiffey's

credibility and did not simply provide a cursory or conclusory statement finding her not fully

credible.  "After stating that [Stiffey's] statements were not entirely credible, the ALJ discussed the opinion evidence and explained how the objective medical evidence of record did not support Plaintiff's claims."  Heaberlin v. Astrue, Civ. Act. No. 10-478, 2012 WL 11037, at * 1 n. 1 (W.D. Pa. Jan. 3, 2012).   Accordingly, the Court rejects Stiffey's challenge to the ALJ's credibility finding.

**C.  The ALJ's RFC was supported by substantial evidence.**

Other than the challenges to the credit given to the opinion of Dr. Singh, Dr. Malik, and Nurse Rock, the issue of concentration, and the credibility assessment, Stiffey makes no further specific challenge to the RFC.  Based on the Court's review of the record as a whole, and there being no error on the part of the ALJ concerning the treatment of the acceptable medical and "other" source opinions and concerning his credibility determination, the Court finds that ALJ's RFC finding is supported by substantial evidence.

The Third Circuit in Fargnoli v. Massanari, 247 F.3d 34 (3d Cir. 2001), explained that in reviewing an RFC determination:

> [t]he ALJ must consider all relevant evidence when determining an individual's residual functional capacity in step four. See 20 C.F.R. §§ 404.1527(e)(2), 404.1545(a), 404.1546; Burnett, 220 F.3d at 121. That evidence includes medical records, observations made during formal medical examinations, descriptions of limitations by the claimant and others, and observations of the claimant's limitations by others. See 20 C.F.R. § 404.1545(a). Moreover, the ALJ's finding of residual functional capacity must "be accompanied by a clear and satisfactory explication of the basis on which it rests." Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981).  In Cotter, we explained that [i]n our view an examiner's findings should be as comprehensive and analytical as feasible and, where appropriate, should include a statement of subordinate factual foundations on which ultimate factual conclusions are based, so that a reviewing court may know the basis for the decision. This is necessary so that the court may properly exercise its responsibility under 42 U.S.C. § 405(g) to determine if the Secretary's decision is supported by substantial evidence. Id. at 705 (quoting Baerga v. Richardson, 500 F.2d 309, 312 (3d Cir.1974)).

Fargnoli, 247 F.3d at 41.  The ALJ must indicate pertinent evidence he rejects and explain the reasons for discounting same, but need not refer to every treatment note in a voluminous record. Fargnoli, 247 F.3d at 42-43.  In essence, the reasons for the ALJ's findings must build "an accurate and logical bridge between the evidence and the result." Sarchet v. Chater, 78 F.3d 305, 307 (7th Cir. 1996); Gamret v. Colvin, 994 F.Supp.2d 695, 698 (W.D. Pa. 2014).

The ALJ's review of the case record was thorough and detailed and the bridge well-constructed.  The ALJ determined in his RFC finding that Stiffey was able to perform unskilled sedentary work with certain restrictions.  The SSA defines sedentary work as involving:

> lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(a).  The physical RFC fully accounted for Stiffey's credited back pain with requirements that Stiffey was limited to sedentary work with a sit/stand option every 30 minutes, a stand/walk limit of two hours in an eight hour day, a lifting and carrying limit of 10 lbs. occasionally, and occasional posturals of balancing, stooping, kneeling, crouching and crawling.

Stiffey's credited limitations in mental functioning, also supported by her GAF scores reflecting moderate difficulties, as well as her marked difficulty in dealing with the public, were accommodated by limiting her to simple, routine, repetitive tasks in a low stress environment with occasional simple decision making and occasional changes in work setting, accounting for moderate limitation in concentration, persistence and pace, with no public interaction and with occasional interaction with co-workers and supervisor.  By limiting Stiffey to no interaction with the public contact and occasional interaction with coworkers and supervisors, the ALJ's RFC addresses the medical record, and Stiffey's difficulty interacting with people.  The ALJ also cites Stiffey's activities of daily living, mental status exam findings and her GAF scores as a basis for

his determination that her mental impairments do not prevent her from working jobs with the restrictions as he found. R. 36, 38. Thus, the ALJ addressed Stiffey's credited reports of pain and mental health difficulties and accounted for them in his physical and mental RFC. Review of the record as a whole indicates that the RFC findings are supported by substantial evidence.

## VI. Conclusion

For the foregoing reasons and based upon review of the record as a whole, the decision of the Commissioner that Stiffey was not disabled is supported by substantial evidence. Accordingly, the Commissioner's decision will be affirmed. An appropriate order will be entered granting the Commissioner's motion for summary judgment, denying Ms. Stiffey's motion for summary judgment, and affirming the decision of the Commissioner.

March 17, 2017

_____
Lisa Pupo Lenihan
United States Magistrate Judge